UNITED STATES of America, Appellee,

v.

Charles Wallace NOLAN, Jr., a/k/a "Charlie", a/k/a Rocco Favorite, a/k/a Harold Mathers, a/k/a Mark Anthony Mallino, Mohan Singh, an Indian National.

Appeal of Charles Wallace NOLAN, Jr.

No. 82–5263.

United States Court of Appeals, Third Circuit.

Argued Jan. 11, 1983.

Decided Sept. 30, 1983.

Rehearing and Rehearing En Banc Denied Nov. 17, 1983.

See also 523 F.Supp. 1235.

J. Alan Johnson, U.S. Atty., Constance M. Bowden (argued), Paul J. Brysh, Michael A. Cauley, Asst. U.S. Attys., Pittsburgh, Pa., for appellee.

H. David Rothman (argued), Pittsburgh, Pa., for appellant.

Before WEIS, SLOVITER and BECKER, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal from convictions on a seven-count indictment, charging both conspiracy and substantive counts of importation and possession of morphine with intent to distribute it, raises two overriding issues: (1)

the sufficiency of evidence to support the conviction; and (2) whether certain evidence seized incident to the arrest of appellant Charles Nolan, upon which two counts of the indictment depend, must be suppressed because the federal marshals who made the arrest failed to abide by the statutory "knock and announce" requirement, 18 U.S.C. § 3109 (1976), that applies to an arrest of a person in his home. We have no difficulty in concluding that there was sufficient evidence to sustain the convictions.[1] The suppression however presents a close and difficult (and largely unexplored) question of the contours of the exigent circumstances "escape" exception to § 3109. We hold that on the facts of this case the seizure of evidence was lawful. Consequently we affirm the judgment on all counts.

## I. *Factual and Procedural Background*

In October 1978, appellant became a fugitive when he failed to turn himself in to parole authorities for violating parole; a bench warrant issued for his arrest on October 3, 1978. On October 19, 1978, appellant applied for a passport in the name of Rocco Favorite; over the course of the next two years he used this and other fraudulently obtained passports to travel back and forth between Europe, India, and the United States.

In 1978 appellant began to sell morphine to Shipley Danko, whom he had met in 1971 through a mutual friend, James Flora. Danko subsequently became the Government's chief witness. In May of 1979, following detailed instructions given to him by appellant, Danko obtained a passport in the name of Harry Usher, and traveled under that name to India with a friend, Silvio Ferea. There they purchased morphine, and returned to the United States with the morphine secreted in their rectal cavities. The events surrounding the May 1979 trip are the subject of Count III of the indictment, charging appellant with aiding and abetting the importation of morphine in

violation of 21 U.S.C. § 952(a) (1976) and 18 U.S.C. § 2 (1976).

In October 1979, appellant, Danko and James Flora traveled together to India. Appellant and Danko travelled under false passports. In India appellant took Danko and Flora to Benares, where the three of them purchased morphine. They returned to the United States in November 1979 with the morphine concealed in sundry body cavities. Appellant spent one night at Danko's apartment in Pittsburgh; the next day he left, saying that he was going to take his "stuff" to a person named George in McKeesport, Pennsylvania. On a prior occasion appellant had told Danko that George was to replace James Flora as appellant's morphine distributor. These events form the basis of Counts IV and V, which charge appellant with importation of morphine and with possession of morphine with intent to distribute it, in violation of 21 U.S.C. §§ 952(a) and 841(a)(1) (1976), respectively, and 18 U.S.C. § 2.

In January 1980, Danko returned to India with a group of people to purchase morphine. While there he encountered appellant, who invited Danko's party to join his own party to go to Benares to buy morphine. Danko declined, and they separated. Appellant traveled to India again in May, June, and August 1980. On September 9, 1980, after his return from this last trip, he was apprehended at a motel near Pittsburgh and arrested for the 1978 parole violation. Pursuant to appellant's arrest, federal agents seized, *inter alia,* quantities of morphine and hashish; this evidence formed the basis of Counts VI and VII, charging appellant with possession with intent to distribute those two substances, in violation of 21 U.S.C. §§ 841(a)(1) and 844(a) (1976), and of 18 U.S.C. § 2 (Count VI only).

In addition to the substantive counts described above, appellant was also charged in

---

1. We review the record only to determine whether "there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." *Burks v. United* *States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

Counts I and II with engaging in conspiracies from October 1978 to September 1980, with other named and unnamed co-conspirators, to import morphine and to possess morphine with intent to distribute it, in violation of 21 U.S.C. § 963 and § 846 (1976).

Following a three-day jury trial in October 1982, appellant was convicted on all counts and sentenced to concurrent 20-year sentences on each of Counts I through VI and a one-year concurrent sentence on Count VII, to be followed by a lifetime term of special parole, *see* 21 U.S.C. § 841(b) (1976 & Supp. IV 1980), on Counts III, IV, V and VI.

## II. *Sufficiency of the Evidence*

### A. *The Aiding and Abetting Count*

■ Count III charged appellant with aiding and abetting Danko and Silvio Ferea in the importation of morphine.[2] The classic definition of aiding and abetting is found in *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949):

> In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his actions to make it succeed." L. Hand, J., in *United States v. Peoni,* 2 Cir. 100 F.2d 401, 402 [ (1938) ].

Four elements must be proved by the Government to make out a case of aiding and abetting: "[First,] the person who is being aided ... must be intentionally committing a crime; second, the aider or abettor must know that the other is committing a crime; third, the aider or abettor must have the purpose to aid that other to commit the crime; and, finally, fourth, the aider must in fact render aid or assistance." *United States v. Interstate Engineering Corporation,* 288 F.Supp. 402, 428 (D.N.H. 1967) (Wyzanski, C.J.); *see United States v. Van Scoy,* 654 F.2d 257 (3d Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 977, 71

L.Ed.2d 114 (1981); *United States v. Scalzitti,* 578 F.2d 507 (3d Cir.1978); *United States v. Cades,* 495 F.2d 1166 (3d Cir.1974). The Government has adduced sufficient proof of each of these elements.

As to the first element, Danko admitted his intent to import morphine. As to the second, Danko's testimony concerning appellant's provision of the necessary information to him was certainly sufficient to establish appellant's knowledge that Danko was, in the very near future, going to act upon the information. In particular, Danko testified that he had told appellant that he would like to go to India to obtain morphine, and that he could use the money he would make by importing it; this conversation occurred just after appellant had expressed a desire to stop making such trips. Appellant thereupon instructed Danko that it would be necessary to obtain a passport in someone else's name and explained to Danko the procedure for securing such a passport. Appellant further told Danko that, upon arriving in New Delhi, he should go to the Crown Hotel and contact certain Frenchmen living on the third floor, who would be able to arrange for Danko to purchase the morphine. Appellant also advised Danko that he should pay no more than 35 rupees per gram for the morphine. Finally, appellant told Danko that the safest way to carry the morphine back into the United States was in a body cavity and explained to him how to package the morphine for transport in this manner. The jury could reasonably infer from this evidence that appellant knew that Danko was going to commit the crime in question. It was therefore unnecessary for the Government to show that Danko had specifically informed appellant of his plans immediately before acting upon them.

The third element also has been satisfied: because Danko specifically expressed an interest in committing precisely the crime that appellant said he had grown weary of committing personally, a jury could easily

---

**2.** Under 18 U.S.C. § 2(a), "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or pro-

cures its commission, is punishable as a principal."

infer that appellant intended to aid Danko in committing that crime by providing such detailed instructions. Further, the evidence of similar subsequent trips taken by Danko and appellant together would have allowed the jury reasonably to infer that appellant benefitted from Danko's first trip because he gained thereby a new partner in his ventures. This conclusion in turn would reasonably allow the jury to find that appellant had a purpose to aid Danko in the commission of this particular crime. We have stated before that

> Although generally proof showing one to be an aider and abettor relates to events occurring before the charged crime of the perpetrator, evidence of acts subsequent to commission of the crime is competent to prove common design, and is significant in evaluating the conduct prior to the commission of the offense of one charged as an aider and abettor.

*Government of the Virgin Islands v. Navarro,* 513 F.2d 11, 15 (3d Cir.), *cert. denied,* 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 698 (1975).

Finally, as to the fourth element, Danko testified that he followed appellant's instructions to the letter on this initial importation trip. There is thus evidence that appellant did in fact aid Danko in the commission of the crime.

Contrary to appellant's contention, therefore, we think there was ample evidence to support all of the elements required to show that appellant aided and abetted Danko in the importation of morphine in May or June of 1979.[3]

## B. *The October-November 1979 Substantive Counts*

Appellant challenges on several grounds the sufficiency of evidence as to Count IV, charging importation, and Count V, charging possession with intent to distribute, deriving from the October-November 1979 trip to India made by appellant, Danko, and James Flora.

First, appellant complains that no test was made on the substance allegedly imported to prove that it was a "controlled substance" within the meaning of 21 U.S.C. § 812 (1976 & Supp. V 1981); the identification of the substance as morphine was supported only by Danko's testimony that it had been purchased in India, and by the testimony of Danko and Danko's girlfriend, Linda Wojtkowski, that they had injected some of the substance and recognized it as morphine by its appearance and its effects on them. Appellant's contention that the Government must introduce evidence of a chemical analysis of a substance in order to establish its composition is insupportable. *See, e.g., United States v. Clark,* 613 F.2d 391, 405–06 (2d Cir.1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *United States v. Quesada,* 512 F.2d 1043, 1045 (5th Cir.), *cert. denied,* 423 U.S. 946, 96 S.Ct. 356, 46 L.Ed.2d 277 (1975); *United States v. Lawson,* 507 F.2d 433, 438–39 (7th Cir.1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). The testi-

---

**3.** This case is distinguishable from *United States v. Moses,* 220 F.2d 166 (3d Cir.1955). In that case, the defendant Moses directed undercover agents to a supplier of drugs at the agent's request but did not take part in the actual sale, was not present at the time of the sale, and had no personal or financial interest in the sale nor any association or collaboration with the seller's enterprise. Her only connection to the seller was as a customer, and the evidence established that she acted at the buyers' behest; since the evidence showed at most that she was allied with the buyers, we held she could not be convicted of aiding and abetting the sale of heroin. In this case, in contrast, appellant aided an importer and was charged with aiding and abetting an importation. That

aid was minute in its detail, going well beyond merely putting appellant in touch with importers or suppliers. Further, the subsequent association of appellant and Danko in the general scheme to import morphine provides evidence of involvement by appellant in Danko's trip in May or June of 1979. It cannot, therefore, be said that there is "the lack of any community of scheme between the defendant and the principal wrongdoers," *id.* at 169. *See also United States v. Barnett,* 667 F.2d 835, 844 (9th Cir. 1982) (evidence established aiding and abetting manufacture of PCP where defendant advertised manual containing the chemical formula for phencyclidine, instructions for manufacture of that drug, and reliable sources for constituent chemicals and equipment).

mony of Danko and Wojtkowski, both habitual users of morphine, that the substance in question was morphine is more than sufficient to present a jury question on this issue, and the jury could reasonably have concluded that the substance was morphine.

 Appellant next argues that there was insufficient evidence of intent to distribute on Count V, because the quantity of morphine imported was consistent with appellant's having imported the morphine solely for his personal use as an addict. However, the evidence established that appellant and his companions purchased 300 grams of morphine in India for $300 and that this quantity had a street value in the United States of $75,000 to $90,000. A potential profit of $75,000 to $90,000, even divided among the three purchasers, is sufficient to allow a jury to infer intent to distribute. *See United States v. Davis,* 582 F.2d 947, 952 (5th Cir.1978) (gross profit of $3,000 on $5,000 resale sufficient to allow jury to infer intent to distribute), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979); *United States v. Riggins,* 563 F.2d 1264, 1266 (5th Cir.) (profit of $3,000

on $3500 resale sufficient), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 150 (1978). Moreover, Danko testified that appellant said he was taking his "stuff" to George in McKeesport, whom appellant had previously identified to Danko as appellant's new morphine distributor. It was certainly reasonable for the jury to infer that the "stuff" appellant was taking to George was morphine to be sold. There was thus sufficient evidence both that the substance imported in November 1979 was morphine and that appellant intended to distribute that morphine to support the jury's verdict.[4]

### C. The Conspiracy Counts

Appellant lastly challenges the sufficiency of evidence of conspiracy to import morphine and conspiracy to possess with intent to distribute it. Both conspiracies are alleged to have run from October 1978 through September 1980.[5]

Largely through the testimony of Danko, the Government established the following facts supporting the conspiracy counts. Danko first met appellant through James

---

4. Appellant also argues that the charge in Count V that he aided and abetted possession with intent to distribute is "duplicitous" of the Count I conspiracy charge encompassing the same events. "Duplicity is the joining in a single count of two or more distinct and separate offenses." *United States v. Starks,* 515 F.2d 112, 116 (3d Cir.1975), *rev'd in part on other grounds sub nom. Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). But duplicity, so defined, is not what appellant is complaining about. We assume that appellant means that Counts I and V are multiplicious, i.e., they charge the same offense, *see id.* at n. 5, and that he was thus placed in double jeopardy because the overt acts alleged in the two counts were identical. The two counts, however, charge distinct crimes. Count I charges conspiracy, which requires proof of agreement but does not, under 21 U.S.C. § 846, require proof of any acts committed in furtherance of the conspiracy; aiding and abetting, which does not require proof of agreement, does require proof that the substantive crime has been committed. Thus Counts I and V are not multiplicious. *Cf. Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) (as a matter of statutory construction, crimes are distinct for double-jeopardy purposes if each requires proof of a

fact that the other does not); *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (same); *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (same).

5. Appellant also alleges that the charges in Counts I and II are multiplicious (appellant again uses the term "duplicitous," which we take to mean multiplicious, *see supra* note 5). Appellant's contention on this point is answered by *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), in which the Supreme Court held that a defendant convicted of both conspiring to import marijuana into this country, in violation of 21 U.S.C. § 963, and conspiring to distribute marijuana, in violation of *id.* § 846, could be sentenced to consecutive sentences without being placed in double jeopardy. Although there may have been one agreement with multiple objectives, the Court held Congress intended to allow multiple punishment upon proof of multiple objectives, "importation" and "distribution," and this scheme did not violate the double jeopardy clause. Similarly here, though there may be a single agreement, it encompassed two objectives, "importation" and "possession" with intent to distribute, violating two distinct statutes, respectively § 963 and § 846.

Flora, another named co-conspirator. In 1978, at or before the time the conspiracy is alleged to have commenced, Danko began to buy morphine from appellant. Appellant told Danko that he had brought the morphine from India and that since 1973 he had been importing morphine and distributing it in Pennsylvania through James Flora. In May 1979, appellant, who had just returned from India, gave Danko detailed instructions how to buy morphine in India. Appellant and Flora had made a number of trips to India between the spring of 1979 and May 1980, during which period neither appellant nor Flora had any regular means of support. There was evidence to show that appellant, Flora, and Danko returned together to the United States from one such trip, in October 1979, with morphine. Appellant and Flora were again in India together in January 1980 for the purpose of purchasing morphine. Finally, soon after his return from India in September 1980, appellant contacted Flora.

■ We begin our discussion by noting that the essence of a conspiracy is an agreement, *see United States v. Kates*, 508 F.2d 308, 310 (3d Cir.1975), and that the Government may rely on circumstantial evidence of appellant's involvement in the conspiracies alleged, rather than having to prove a formal agreement. *See Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *Kates, supra*. Moreover, the conspiracy statutes under which appellant was charged, 21 U.S.C. §§ 846 and 963, do not require proof of an overt act in furtherance of the conspiracy. *See United States v. Dreyer*, 533 F.2d 112, 117 n. 6 (3d Cir.1976). Finally, the Government need prove only that appellant conspired

with at least one of the persons named in the indictment; failure to prove that all named co-conspirators conspired with appellant throughout the period alleged is not fatal to the Government's case and is not in itself prejudicial to appellant. *See United States v. Levine*, 569 F.2d 1175, 1178 (1st Cir.), *cert. denied*, 436 U.S. 928, 98 S.Ct. 2824, 56 L.Ed.2d 771 (1978).

■ Under the applicable law, the evidence adduced at trial was sufficient to allow the jury to conclude that, from at least October 1978,[6] appellant was engaged in an agreed-upon, ongoing venture with Flora to import and distribute morphine and that, in October 1979 at the latest, Danko also became a member of this conspiracy. Having found that an agreement existed during this period, the jury could infer that the October 1979 trip formed a part of the agreed-upon scheme to distribute morphine.[7] Appellant's contentions are thus without merit; the overt acts proven were all relevant to showing a conspiracy and were, together with other evidence introduced by the Government, sufficient to show the existence of the conspiracies alleged in Counts I and II.

### III. *The Suppression Issue—Counts VI & VII*

As we noted above, the officers who arrested appellant on September 9, 1980 seized morphine, hashish, various documents and drug paraphernalia from appellant's motel room. Appellant does not challenge the sufficiency of the government's evidence on Counts VI and VII; rather he (correctly) points out that if the evidence was unlawfully seized, the counts must fall.[8] Appellant moved to suppress those

6. The indictment charged a conspiracy beginning "in or about October of 1978"; we have recognized that use of such language signifies the grand jury's reluctance to pinpoint an exact date, *see United States v. Somers*, 496 F.2d 723, 744–45 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). Since the evidence supports the existence of a conspiracy beginning at least as early as October 1978, appellant's assertion that the starting date was chosen merely to allow the Government to in-

troduce evidence that appellant had become a fugitive is without merit.

7. Appellant apparently concedes the sufficiency of evidence of a conspiracy to import morphine on this trip, although he argues that no evidence of intent to distribute it was adduced.

8. If the evidence was unlawfully seized, the argument continues, the convictions on the other counts are tainted and must be reversed

items and any testimony by the officers concerning the items seized, on the grounds that the seizure was preceded and made possible by these officials' entry into his motel room on two occasions without knocking on the door and announcing their identity and purpose, in violation of 18 U.S.C. § 3109.[9]

A. *Section 3109 and the Exigent Circumstances Exception: Basic Principles*

As we have observed before, *see United States v. Kane,* 637 F.2d 974 (3d Cir.1981), section 3109 furthers three goals. First, it reduces the likelihood of injury to police officers, who might be "mistaken, upon an unannounced intrusion into a home, for someone with no right to be there." *Sabbath v. United States,* 391 U.S. 585, 589, 88 S.Ct. 1755, 1758, 20 L.Ed.2d 828 (1968).[10] Second, it seeks to prevent needless damage to private property. Finally, it embodies respect for the individual's right of privacy, which is to be imposed upon as little as possible in making an entry to search or arrest. *See Miller v. United States,* 357 U.S. 301, 313, 78 S.Ct. 1190, 1197, 2 L.Ed.2d 1332 (1958).

The remedy for a violation of section 3109 is suppression of any evidence obtained as a result of the violation. *See Sabbath, supra; Miller, supra; Kane, supra.* This remedy is not expressly established by section 3109, but it has been judicially imposed in recognition of the shared common-law roots of that section and the fourth amendment. *See generally Ker v. California,* 374 U.S. 23, 47–52, 83 S.Ct. 1623, 1636–1639, 10 L.Ed.2d

726 (Brennan, J., concurring & dissenting); *Miller,* 357 U.S. at 306–10, 78 S.Ct. at 1194–96. Section 3109 has been interpreted to apply to breakings pursuant to arrest warrants as well as search warrants, *see Miller,* 357 U.S. at 306, 78 S.Ct. at 1194; *Kane,* 637 F.2d at 977. It has also been recognized, however, that certain exigent circumstances justify an unannounced entry to execute a warrant; evidence obtained under those circumstances will not be suppressed.

The statutory language itself provides one exception: it excuses preliminary notice "when [entry is] necessary to liberate [the officer] or person aiding him in the execution of the warrant." In addition, we noted in *Kane* that the Supreme Court has apparently approved three other exceptions:

"(1) Where the persons within already know of the officers' authority and purpose, or (2) where the officers are justified in the belief that persons within are in imminent peril of bodily harm, or (3) where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door) are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted."

637 F.2d at 978, *quoting Ker v. California,* 374 U.S. 23, 47, 83 S.Ct. 1623, 1636, 10 L.Ed.2d 726 (1963) (Brennan, J., concurring & dissenting).[11] To this list *Kane* added that "a police officer's reasonable belief that announcement might place him or his associates in physical peril" would excuse compliance with the statute. *Id.* The Government contends that the unan-

---

because no other physical evidence of drugs was introduced as to those counts. *See Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939) (evidence obtained in violation of statutory restrictions on wiretapping and any fruits of that violation must be suppressed). Because of our disposition of the case, we need not reach this question.

**9.** Section 3109 provides:

The officer may break open any outer or inner door or window of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance, or when necessary to

liberate himself or a person aiding him in the execution of the warrant.

**10.** Law enforcement officials, of course, might be thought quite capable of protecting their own safety and might often knock and announce before entering even in the absence of section § 3109. Nonetheless, Congress could reasonably have concluded that a directive such as § 3109 would enhance the safety of law enforcement officials.

**11.** The Supreme Court approved these exceptions to § 3109 in *Sabbath, supra,* 391 U.S. at 591 n. 8, 88 S.Ct. at 1759 n. 8.

nounced entries in this case were justified by exigent circumstances. We therefore must determine whether the circumstances attending appellant's arrest on September 9, 1980 fit within one of these exceptions.

B. *The Events of September 9*

On September 9, 1980, an inspector and a deputy from the United States Marshal's Office canvassed motels in Belle Vernon, Pennsylvania, acting on a tip from Danko that appellant might be staying in one of them.[12] The marshals had in their possession the outstanding bench warrant that had been issued in October 1978 to arrest appellant for his parole violation. At about 2:00 P.M., they reached Motel 6, where the desk clerk recognized a photograph of appellant and told the marshals that appellant was registered in Room 48 under the name "Rocco Favorite." The clerk also told them that "Mr. Favorite" had re-registered at 12:30 P.M. for an additional night and had apparently returned to his room. The two marshals went to the door of room 48, which was located near the rear exit on the ground floor of the motel. They observed that the rear exit of the motel let out into the parking lot. Listening at the door, they heard the sounds of a television or a radio.

The marshals then went back to the motel office to obtain a passkey. The manager returned with them to room 48, where the marshals had him knock on the door, say "manager," and open the door. As the door opened, the marshals entered the room and simultaneously announced their identity. Appellant was not there, but the marshals noticed what looked like drug paraphernalia on a table.[13] They withdrew after less than a minute without disturbing anything.

One marshal then watched the room while the other called for reinforcements. At 3:30 P.M. two more officers from the

Marshal's Office arrived, as did an agent from the Drug Enforcement Administration, and the five officers set up a stakeout to await appellant's return. When appellant arrived, at about 4:45, two officers (apparently not in uniform) approached the door of his room as he walked towards it, in an attempt to apprehend him before he entered his room, but they arrived at the door after appellant had entered and locked it. Once again, the officers had the manager open the door and say "manager," fearing that if they announced their identity and purpose, appellant would destroy the paraphernalia inside. The D.E.A. agent shouted "police" as the door opened. Appellant was subdued and arrested after a brief struggle, and the paraphernalia, a quantity of morphine, a quantity of hashish, and various identification papers were seized.

C. *The District Court's Resolution*

The district court agreed with appellant that both entries had violated the terms of section 3109. In a careful opinion, the court first considered a number of preliminary questions and concluded (1) that section 3109 controls execution of an arrest warrant; (2) that a motel room is a "house" for purposes of section 3109; (3) that use of a passkey is a breaking within the meaning of section 3109; and (4) that the requirements of section 3109 were not avoided because the manager, at the officers' behest, rather than the officers themselves, actually unlocked the door. 530 F.Supp. at 392–93. We endorse the court's conclusions on these points and need not embellish on its reasoning here. The district court, however, denied appellant's motion to suppress the evidence seized pursuant to the second entry, as well as the officers' testimony concerning what they saw during both entries,

---

12. The evidence described in the text was adduced at a suppression hearing, and is the subject of the district court's findings thereon, *see United States v. Nolan*, 530 F.Supp. 386 (W.D. Pa.1981). No suggestion is made that the findings described in this part are clearly erroneous.

13. The paraphernalia consisted of several syringes, some spoons with powder on them, a bottle labeled "lactose," and a foil and cellophane packet with powder on the cellophane. There is no evidence, however, that, before entering, the officers suspected that there was drug paraphernalia in the room.

holding that there were exigent circumstances justifying both the first and the second entries and that, in any event, the officers acted in good faith, thereby rendering inapplicable the sanction of exclusion.

The court found that the first entry was justified by the officers' reasonable belief (1) that [appellant] would be likely to try and escape; (2) that if he was in his room and tried to escape he would likely be successful in the short run because of the limited number of officers on the premises in relation to the potential number of exits and because of the relative proximity of the parking lot; and (3) if he was not in his room he would probably see them waiting for him and escape; and (4) that if [appellant] escaped he would likely be successful in the long run through his use of aliases and transient living quarters and travel to foreign countries.

530 F.Supp. at 394. The belief was reasonable, the court found, in light of the officers' knowledge (1) that appellant had avoided capture on his parole violation for two years, in part through his use of aliases, and (2) that the motel room had three potential exits, a door, and two windows.

The district court also found that the second entry was justified. Although fear of escape no longer provided an exigent circumstance justifying unannounced entry, the district court found justification on the basis of the officers' reasonable belief that the objects they had seen during their first

entry were narcotics-related paraphernalia, and that appellant, if he knew he was about to be arrested, would attempt to destroy those objects by flushing them down the toilet in the bathroom, which was in close proximity to the room in which the paraphernalia rested. Thus, the only exigent circumstance justifying the second entry was the fear that evidence would be destroyed, but the district court found this sufficient. Again, we find ourselves in complete agreement with the district court on this matter. Thus, the only point left for our resolution is the propriety of the first entry by federal law enforcement officials under the "escape exception" to section 3109, an issue to which we now turn.[14]

### D. The Contours of the Escape Exception

Prior judicial decisions have left the doctrinal contours of the "escape exception" to the knock and announce requirements of section 3109 charted only vaguely. To resolve the propriety of the first unannounced entry in this case a more precise map must be drawn.[15]

■ We believe that a fair understanding of the purposes underlying section 3109 requires that law enforcement officials be able to invoke the "escape exception" to section 3109 only when they reasonably believe there is some likelihood that escape will be attempted and that escape will be

---

14. As noted in the text, the district court had also invoked the putative "good faith" exception to the exclusionary rule. Until the Supreme Court says otherwise, its latest statement is that "to date we have not recognized such an exception and we decline to do so here." *Taylor v. Alabama*, 457 U.S. 687, 693, 102 S.Ct. 2664, 2669, 73 L.Ed.2d 314 (1982). Under these circumstances the district court was not free to adopt an exception that the Supreme Court has itself not yet adopted.

15. The Government has argued that because appellant was not present at the time of the first search of his motel room, compliance by the officers with the requirements of § 3109 would have been a "useless gesture," and hence that non-compliance cannot be grounds for suppression. This position is not without adherents. *See Payne v. United States,* 508

F.2d 1391, 1393–94 (5th Cir.), *cert. denied,* 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975); *Jones v. State,* 4 Ala.App. 159, 58 So. 1011 (1912) (interpreting parallel Alabama statute); *People v. Johnson,* 231 N.Y.S.2d 689 (Ct.Gen. Sess.1962) (interpreting parallel New York statute); *Collins v. State,* 184 Tenn. 356, 199 S.W.2d 96 (1947) (interpreting parallel Tennessee statute). While there are contrary contentions in *United States v. Gervato,* 474 F.2d 40, 44 (3d Cir.), *cert. denied,* 414 U.S. 864, 94 S.Ct. 39, 38 L.Ed.2d 84 (1973), that case does not require rejection of the Government's position; hence, the question is open in this Court. The question is a difficult one that has been addressed by the parties only in passing. Inasmuch as we find that the evidence need not be suppressed in any event, we do not reach it here.

successful. In making this determination, the likelihood of an attempt and the likelihood of success must be considered together. Where law enforcement reasonably believes the likelihood of an attempt to be strong, weaker evidence that an attempt would be successful will suffice to invoke the exception. Where the likelihood of an attempt is more remote, there must be stronger evidence known to law enforcement at the time that an attempt would be successful. Where both likelihoods are supported only weakly, officers must comply with the requirements of section 3109, unless, of course, another exception to that statute applies.

Our holding here obviously implies that federal law enforcement officials do not have to wait for reinforcements to arrive before executing an arrest warrant in order to prevent the "escape exception" to section 3109 from limiting the protective scope of that statute. If the federal officers have probable cause to believe a suspect named on an arrest warrant is inside a dwelling and if they reasonably believe there is some likelihood of escape if they knock and announce before entering, they may generally enter without complying with section 3109.[16] Nor should courts assume that law enforcement can always significantly diminish the likelihood of successful escape by assigning one officer to each exit of a dwelling then occupied by the subject of an arrest warrant, or that the ability to cover each potential exit with an officer necessarily precludes the existence of exigent circumstances. Circumstances may well lead law enforcement reasonably to believe that such a spreading of strength would enable the suspect to escape, even when they do not believe that the spreading would subject them to a threat of violence sufficient to invoke the "dangerousness exception" to section 3109.

■ Although the issue is a close one, we do not think the district court clearly erred in finding that the federal law enforcement officials involved here could reasonably believe the likelihood of successful escape was high enough to warrant their dispensation with the knock and announce requirements of section 3109.[17] First, the district court found that there was a likelihood of an attempt to escape. Although there may be some difference between simply failing to turn oneself in to a parole officer when told to do so and actively attempting to escape identified law enforcement officials knocking at one's door, and although there was no specific evidence of propensity to escape, appellant was not the average criminal. He had been a fugitive for two years and had traveled to foreign countries under false passports and made use of numerous aliases throughout that time. Thus the district court's finding was not clearly erroneous on this point.

Second, the district court found that, had there been an attempt, the police reasonably could have believed there to be a likelihood of success. If we accept the district court's findings that the federal officers knew the number of exits to appellant's motel room,[18] there were but two federal officers present at the time of the first entry. With two or possibly three exits to

---

**16.** We reserve judgment, however, about a case involving a deliberate attempt by law enforcement officials to circumvent section 3109 by undermanning execution of an arrest warrant. We suspect, however, that law enforcement officers' concern for their own safety upon entering an occupied dwelling will usually inhibit deliberate undermanning.

**17.** In reviewing the district court's decision, we are bound by that court's findings of fact so long as they are not clearly erroneous. *See Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir.1972); *United States v. Delerme,* 457 F.2d 156, 158–60 (3d Cir.1972) (Fed.R.Civ.P. 52(a) standard applies to findings made by district court in non-jury criminal proceedings).

**18.** We concede that the record does not provide strong support for the district court's finding that the officers knew how many potential exits there were in appellant's motel room before the first entry. Neither officer went to the rear of the motel, so far as the record shows; both of them remained at the front door to make the first entry. While this point is troublesome, we do not view it as affecting the outcome.

be covered,[19] given the options an arrest strategy that must be left to the officers, *see* discussion *supra,* the finding that there was some likelihood that an escape attempt would be successful is not clearly erroneous. And when both factors are considered together, the evidence is sufficient to insulate the district court's finding that exigent circumstances excused compliance with § 3109.[20]

### E. *The Fourth Amendment Problem*

If the prohibitions of section 3109 coincided perfectly with those of the fourth amendment bar on unreasonable searches, our inquiry would now be at an end. Having determined that the federal officials did not violate section 3109, we would also have determined that the fourth amendment had been satisfied. We believe, however, that the prohibitions of the two provisions overlap. Some conduct authorized by section 3109 may nonetheless violate the Constitution; conversely, some conduct permissible under the Constitution may be barred by section 3109. And, of course, some conduct may be unlawful under both provisions.

Accordingly, after justifying our belief in the imperfect coincidence of section 3109 and the Constitution, we proceed to examine whether the search by federal officials in this case was constitutionally defective.

We begin by noting that the Supreme Court has never definitively determined the relationship between section 3109 and the Constitution.[21] The Court's opinions in *Ker v. California, supra,* and *Miller v. United States, supra,*[22] provide useful guidance, however.

In *Miller,* the Court discussed at some length the venerable common-law roots of the knock and announce requirement,[23] and in concluding that a failure by federal law enforcement officers to announce their identity and purpose required suppression of the evidence seized, remarked:

> The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application. Congress, codifying a tradition embedded in Anglo-American law, has declared in § 3109 the reverence of

**19.** The district court found that there were three exits, though it appears from the record that two of them were adjacent windows, so that for practical purposes there may have been but two exits, and we cannot tell from the record whether the windows were of the sliding variety.

**20.** Because we have held that the second unannounced entry was justified by the "destruction of evidence exception" to section 3109, we do not have to decide whether, with five officers present, the "escape exception" could also be used to justify the second entry. As a preliminary matter, however, we suspect the presence of five officers would significantly diminish the probability of a successful escape—probably to the point where exigent circumstances could not be said to exist.

We note also that, although there was some testimony in the record remotely linking appellant with a suspect in a 1979 slaying of a police officer, the district court did not find exigent circumstances based on any danger to the officers. Moreover, the Government does not rely on any violent proclivities in appellant to justify the unannounced entry, but only on the fact that appellant had been a fugitive for two years prior to his arrest and had a propensity to make use of aliases. Thus the "dangerousness" exigent circumstance exception to

§ 3109, *see supra* p. 598, does not come into play in this case.

**21.** Although the courts of appeals seem to be in general agreement that there is some constitutional dimension to the knock and announce requirement, *see, e.g., Kane, supra,* 637 F.2d at 977; *United States v. Valenzuela,* 596 F.2d 824, 830 (9th Cir.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979); *United States v. Agrusa,* 541 F.2d 690, 696–97 (8th Cir.1976), *cert. denied,* 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977); *United States v. Mapp,* 476 F.2d 67, 75 (2d Cir.1973), none has had occasion to address the question whether § 3109 is, in terms, a constitutional requirement.

**22.** The Court in *Miller* was reviewing a judicially developed rule of the District of Columbia substantially identical to § 3109. *See Accarino v. United States,* 179 F.2d 456, 465 (D.C.Cir. 1949). However, the Court treated the question as if it arose under § 3109.

**23.** The knock and announce requirement has common-law roots dating to the 17th century, *see* 2 W. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 4.8(a) (1978), as does the fourth amendment, *see id.* § 1.1.

the law for the individual's right of privacy in his house.

357 U.S. at 313, 78 S.Ct. at 1198 (footnote omitted). The Court did not, however, expressly tie the knock and announce requirement to the fourth amendment's proscriptions against general warrants and searches and seizures on less than probable cause.[24]

In *Ker v. California, supra,* a plurality of four Justices concluded that state police had not violated the fourth amendment in breaking into an apartment to arrest the occupant without a warrant, and without first knocking and providing notice of their identity and purpose; the search incident to that arrest was therefore upheld.[25] The plurality initially examined the lawfulness of the officers' entry as a question of California law and concluded that, under state law, the unannounced entry was lawful.[26] The plurality then addressed the question whether the state-law justification was sufficient to make the arrest "reasonable" under the fourth amendment. Finding *Miller* "inapposite for state prosecutions, where admissibility is governed by constitutional standards," 374 U.S. at 39, 83 S.Ct. at 1633,[27] the plurality held that "in the particular circumstances of this case the officers' method of entry, sanctioned by the law of California, was not unreasonable under the standards of the Fourth Amendment as applied to the states through the Fourteenth Amendment." *Id.* at 40–41, 83 S.Ct. at 1633–1634.

While the *Ker* plurality did not expressly disclaim the position that the knock and announce requirement is in terms constitutional, the plurality's analysis appears to do so. Under that analysis, the knock and announce requirement is in the first instance a question of local law, not dictated in its particulars by the fourth amendment. The fourth amendment is implicated only by the overall reasonableness of the state's statutory scheme as applied by law enforcement officers and interpreted by the courts of the jurisdiction. Thus, the *Ker* plurality would appear to reject the proposition that the fourth amendment mandates a knock and announce requirement with precise and narrowly defined exceptions, although a failure by police to knock and announce could, depending on the circumstances, violate the more general fourth amendment reasonableness requirement for any arrest.

Although we are not bound by the *Ker* plurality opinion,[28] we are influenced by it

**24.** The Court did quote from William Pitt's famous oration attacking the use of general warrants: " 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement.' " *Miller, supra,* 357 U.S. at 307, 78 S.Ct. at 1195. This passage is considered to be a forebear of the fourth amendment. *See generally* N. Lasson, *The History of Development of the Fourth Amendment to the United States Constitution* 49 (1937).

**25.** Justice Harlan concurred only in the result, refusing to apply the fourth amendment to the states and finding no violation of fundamental fairness under the fourteenth amendment. The four dissenting Justices unequivocally maintained that the knock and announce requirement was mandated by the fourth amendment and insisted that failures to comply with the statute be justified under narrow, federally defined exigent circumstances, *see supra* Part III (*Kane, supra,* quoting *Ker, supra* (Brennan, J., concurring & dissenting)). The dissent not-

ed the common source of the fourth amendment and the knock and announce requirement and asserted that "similar, if not the same, dangers to individual liberty" motivated the two safeguards. 374 U.S. at 52, 83 S.Ct. at 1639.

**26.** The plurality first concluded that there was probable cause to arrest appellants. The dissent did not address this question.

**27.** The plurality noted that, pursuant to its supervisory authority, the Court had established rules governing admissibility of evidence in federal courts that were more stringent than the rules compelled by the fourth amendment. *Miller* was cited as such a supervisory case. 374 U.S. at 31, 83 S.Ct. at 1628.

**28.** As we noted above, the Supreme Court in *Sabbath v. United States, supra,* apparently approved of the exceptions to the knock and announce requirement listed by the dissenters in *Ker.* We do not, however, read *Sabbath* as approving the *Ker* dissenters' position on the constitutionality of § 3109. The Court in *Sabbath* held, purely as a matter of statutory inter-

and are persuaded, when we consider the divergent purposes of the fourth amendment and section 3109, that the latter does not embody a constitutional requirement. While the purposes and origins of the knock and announce and of the fourth amendment requirements are similar, they are not identical, and the purposes of the latter properly should be more carefully guarded. The fourth amendment was originally fashioned to outlaw the use of general warrants and writs of assistance, which allowed agents of the government arbitrarily to conduct searches for evidence of wrongdoing, to the detriment of individual privacy; "[t]he colonial experience under the writs was unmistakably 'fresh in the memories of those who achieved our independent and established our form of government.'" *Ker, supra,* 374 U.S. at 51, 83 S.Ct. at 1638 (Brennan, J., concurring & dissenting) (footnote omitted) (quoting *Boyd v. United States,* 116 U.S. 616, 625, 6 S.Ct. 524, 529, 29 L.Ed. 746 (1886)). The goal of curbing arbitrary government power to intrude at will into an individual's privacy differs from the goals of the knock and announce requirement, which addresses only the manner in which a legitimate and inevitable government intrusion into the target person's privacy is to take place. Such an intrusion, it is true, can be made in a way so violative of the privacy and property rights of the occupants of the dwelling as to be unreasonable within the meaning of the fourth amendment, *see Ker, supra,* but not every violation of the statute will present such an unreasonable intrusion.

■ Examining the facts of this case, we do not believe the search and seizure here was unreasonable. First, there was no danger of destruction of property, since the manager opened the door with a passkey. Second, the intrusion into appellant's privacy was not carried out flagrantly: the entries took place in the middle of the day rather than at night, and the officers did announce their identity as they entered, albeit tardily for statutory purposes. Moreover, the officers had a valid warrant for appellant's arrest, and ample grounds to believe that appellant was in the motel room. We do not think these circumstances give rise to the kind of unreasonable seizure proscribed by the fourth amendment. We therefore believe the district court reached the correct decision on the suppression issue. The conviction on Counts VI and VII along with those on Counts I through V will therefore be affirmed.[29]

pretation of § 3109, that none of the exigent circumstances recognized by the *Ker* dissenters were met in the case under review:

> Exceptions to *any possible* constitutional rule relating to announcement and entry have been recognized, *see Ker v. California, supra,* [374 U.S.] at 47, 83 S.Ct. at 1636 (opinion of Brennan, J.,), and there is little reason why those limited exceptions might not also apply to § 3109, since they existed at common law, of which the statute is a codification.

391 U.S. at 591 n. 8, 88 S.Ct. at 1759 n. 8 (Emphasis added). The Court had no occasion in *Sabbath* to explore the contours of a constitutional rule; it merely approved the exceptions as a matter of statutory construction.

**29.** We have considered all of appellant's other contentions and found them to be patently without merit. These contentions are: (1) that the district court erroneously denied total use immunity to an allegedly exculpatory witness for appellant; (2) that the district judge erred in failing to disqualify himself; (3) that the court erred in admitting into evidence the written instructions from appellant to Danko and in declining to charge as requested on that subject; (4) that the court erred in admitting appellant's false passports and other evidence of use of fictitious names and in declining to charge as requested on these subjects; (5) that the court erred in admitting evidence of appellant's prior convictions and alleged prior sale of morphine, and in declining to charge as requested on this evidence; (6) that appellant was denied due process by the evidence received to rebut appellant's testimony; (7) that appellant's fifth amendment right to remain silent was violated because the Government questioned him at trial concerning his failure before trial to admit his authorship of the written instructions to Danko explaining how to smuggle morphine; (8) that the sentence was excessive and the court erred in not sentencing under the Narcotic Addicts Rehabilitation Act; (9) that the district court erred in failing to sever the trial on Counts I through V from the trial on Counts VI and VII; and (9) that there was a prejudicial variance in the proof at trial, i.e., that appellant was convicted on counts of conspiracy based upon evidence of different conspiracies.