

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-26-1995

# Bodine v. Warwick

Precedential or Non-Precedential:

Docket 94-7510

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Bodine v. Warwick" (1995). *1995 Decisions.* Paper 316.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/316

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 94-7510 and 94-7621
_____

HARRY W. BODINE, JR.,
Appellant in 94-7510

v.

JAMES WARWICK, Trooper; RICHARD FRUNZI,
Trooper; PHILIP PITT, Trooper; STATE OF
DELAWARE; CLIFFORD M. GRAVIET, Colonel;
ARTHUR BLANSFIELD, Captain

Trooper James Warwick; Trooper Richard
Frunzi, Trooper Philip Pitt,
Appellants in 94-7621

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
(D.C. Civil No. 92-00727)
_____

Argued:  June 8, 1995
Before:  BECKER, NYGAARD, and ALITO, Circuit Judges

(Opinion Filed:  December 26, 1995)

_____

MARK B. FROST, ESQ. (Argued)
Pier 5 at Penn's Landing
Philadelphia, PA  19106

Attorney for Appellant/
Cross Appellee, Harry W. Bodine

GREGG E. WILSON, ESQ. (Argued)
JEFFREY M. TASCHER
Deputy Attorneys General
DEPARTMENT OF JUSTICE
820 N. French Street
Wilmington, DE 19801

———————————————

OPINION OF THE COURT

———————————————

ALITO, Circuit Judge:

Harry W. Bodine, Jr. filed this action, seeking, among other things, to recover under 42 U.S.C. §1983 on claims that certain Delaware State Troopers violated his Fourth Amendment rights by illegally entering his house without first knocking and requesting admission, by arresting him without probable cause, and by using excessive force to effect his arrest.  At the close of the evidence, the district court awarded judgment as a matter of law in favor of Bodine on the issue of liability with respect to the illegal entry claim.  The court later instructed the jury that it need not determine whether the troopers used excessive force in arresting Bodine because their unlawful entry rendered any use of force unreasonable.  The jury then returned a verdict in favor of the troopers on the unlawful arrest claim and, on the remaining claims, awarded Bodine compensatory damages of $25,000, an amount that was far below what he had sought.  Bodine appealed, arguing that the small award of damages was against the weight of the evidence.  The troopers cross-appealed, contending, among other things, that the district court erred in granting judgment as a matter of law in favor of Bodine on the illegal entry claim and in framing its instructions regarding their

2

liability for damages stemming from their conduct.  We hold that judgment as a matter of law was improper in this case and that the court's analysis of the issue of damages was incorrect.  We therefore reverse and remand for further proceedings.

## I.

This case resulted from events that occurred in December 1990.  Bodine had custody of his three sons, but their mother, Helen Knight, had visitation rights every other Saturday. On December 21, Bodine failed to appear at a hearing in Delaware Family Court to show cause why he should not be held in contempt for violating a prior court order regarding visitation.  Bodine telephoned the court and said that "although he received notice of the hearing . . . he had no intention of appearing . . . or bringing the children with him. . . . "  The court issued an order holding Bodine in contempt and fining him $100.  To make up for visits that Knight had lost as a result of Bodine's conduct, the court ordered that the children be turned over to her for visitation at 8 a.m. at the Smyrna, Delaware, police station on the next three Saturdays.  The order further provided:

> Any police agency is authorized to assist Ms. Knight in securing Mr. Bodine's compliance with this order upon being presented with a certified copy thereof. Should police assistance again become necessary to secure the Court ordered visitation, Ms. Knight is specifically authorized to enter upon the property of Mr. Bodine in the company of a police officer to receive her children.

Id. at B-12.

3

On the next Saturday, December 29, Bodine did not bring the children to the Smyrna police station at 8 a.m., as required by the order, and Knight sought the assistance of the Delaware State Police. At some time between 8:10 a.m. and 8:20 a.m., Knight and three state troopers, James Warwick, Richard Frunzi, and Philip Pitt, arrived at Bodine's house. Bodine observed the police cars approach the house. He testified that he thought they were there to enforce the visitation order, but he said that he was surprised that they had come because he and Knight had customarily given each other "a half-hour leeway" in turning over the children.

Trooper Warwick approached the house. Warwick testified that the Family Court order had previously been circulated to the members of his troop, that "Harry Bodine and the whole custody dispute" was a matter of "officer safety concern" for "the entire troop," and that a memorandum concerning the matter had been distributed to the troopers. He also stated that he was "cautious" as a result of two prior visits to the Bodine residence, one for the purpose of executing a warrant for Bodine's arrest and the other in connection with the custody dispute. On one of those occasions, Warwick said, Bodine had told him "something to the effect that" if the police ever tried to arrest him, "it [was] not going to happen" and he was "not going to let [them] arrest [him]." According to Warwick, Bodine also said that if the police came to his house, they were "going to pay." As a result of these experiences, Warwick said that he regarded Bodine as "unstable" and "very violent."

4

The troopers walked to the front door and knocked, but Bodine told him to go to the back because a Christmas tree was blocking the front door.  They then walked to the back door and knocked again.  After Bodine opened the door, he and Warwick spoke.  What happened from this point on was the subject of sharp dispute.  According to Warwick, the following occurred.  Warwick asked Bodine why the children had not been brought to the police station by 8 a.m. as required by the court order, and Bodine responded that he had until 8:30 a.m.   Bodine was raising his voice, his eyes were twitching, and his lips were trembling.  These signs caused Warwick concern.  Warwick told Bodine to have the children ready in five minutes, and Bodine said, "I will have them ready when I feel like it."  Warwick was leaning forward at the doorway, and he wanted to continue to talk to Bodine to calm the situation, but Bodine slammed the door and tried to hit Warwick in the face with it.  Warwick jumped back and heard Bodine "fiddling around with the door" on the inside.  It sounded to Warwick as if Bodine was trying to lock the door, so Warwick grabbed the doorknob, pushed the door open, and entered the house, followed by Troopers Pitt and Frunzi.

Warwick advised Bodine that he was under arrest and attempted to grab Bodine's right arm, but Bodine pulled away. Warwick then grabbed Bodine's right arm and tried to handcuff him, but Bodine pulled away again, and they wrestled to the floor.  Pitt then grabbed Bodine's right arm and put his knee and shin against Bodine's back in order to restrict his movements and

5

handcuff him.  The troopers handcuffed Bodine, assisted him to his feet, and removed him from the house.

Bodine, the woman with whom he was then living, and the children who testified for him gave a very different account of these events.  According to Bodine, when he opened the back door, he immediately told Warwick that the children would be ready in five minutes, and Warwick responded, "Okay, you have five minutes."  After closing the door "firmly" because it was old and swollen, Bodine walked away, but Warwick forcibly opened the door, hitting Bodine in the back and knocking him off balance.  Warwick immediately grabbed Bodine's arms from behind and threw him around the kitchen--from the table to the counter to the floor--while Bodine offered no resistance.  Bodine began to scream with pain, and he felt as if his arms were being broken.

When Bodine was thrown to the floor, Pitt came down on Bodine's back with his knee.  While Warwick held Bodine's arms, Pitt placed his knee against the upper portion of Bodine's back and pressed Bodine's head to the floor.  At this point, Bodine heard his neck crack.  Bodine was then raised by the troopers, handcuffed, and escorted to the police station.  He was subsequently convicted in state court for the crimes of menacing and resisting arrest.

After his arrest, Bodine was diagnosed as having serious back injuries, and he eventually underwent three operations.  Bodine testified that he suffered great pain, and the evidence showed that he was completely unable to work for some time.  In addition, he introduced expert testimony that his

injuries would permanently restrict the type of work that he was able to do and the number of years that he would be able to work. According to an economist who testified for Bodine, his total lost wages during his lifetime were between $576,000 and $1,000,000. There was also evidence, however, that Bodine had back problems before his arrest; that he did not report hearing his neck "crack" during some of his initial medical examinations after his arrest; and that his injuries were exacerbated by his failure to follow the regimen that his physician prescribed.

In December 1992, Bodine filed this action in district court against Troopers Warwick, Pitt, and Frunzi, as well as several other defendants who are no longer in the case. In February 1994, the case proceeded to trial on three theories of liability: illegal entry, unlawful arrest, and excessive use of force. At the end of the testimony, Bodine moved for judgment as a matter of law on liability with respect to two of these theories, illegal entry and excessive force. The court granted this motion with respect to the illegal entry claim. Moreover, the court reasoned that, once the troopers entered the house illegally, "any harm or damage that they inflict[ed] on the plaintiff as a result of the illegal entry [was] per se unreasonable . . . and [Bodine] was entitled to damages for that." 3/8/94 Tr. at E-31. The court added that it was therefore unnecessary to submit the issue of excessive force to the jury because the troopers were liable for all of the damages that they caused even if they did not use excessive force. Id.

7

The court also held that the troopers had waived the defense of qualified immunity by not asserting it in their answer or at the pretrial conference.  Id. at E-37.

Before the case was submitted to the jury, Bodine dismissed all claims against Trooper Frunzi for compensatory damages, and the court awarded nominal damages of $1.00 against all of the troopers on the illegal entry claim.  In instructing the jury, the court said that the plaintiff had to prove that the defendants' "conduct" was the proximate cause of the injuries he sustained.  Id. at E-63.  The court stated that it had already determined that the troopers had entered the house illegally and that the jury would therefore not be requested to decide that question.  Id. at E-68.  The court likewise told the jury that it was not required to determine whether the troopers had used excessive force once inside the house because it had "determined as a matter of law that once the officers entered the premises, no amount of force would have been reasonable."  Id. at E-70.

After receiving these instructions and deliberating, the jury found that the troopers had not arrested Bodine unlawfully, that their actions were the proximate cause of injury to him, and that he was entitled to compensatory damages of $25,000.  Bodine moved for a new trial on the issue of damages, but the court denied that motion.  Bodine then appealed, and the troopers cross-appealed.

## II.

We will first discuss the issue of liability with respect to Bodine's illegal entry claim.  As noted, the district

court granted judgment as a matter of law in favor of Bodine on this issue.  In order for us to sustain this ruling, the evidence, viewed in the light most favorable to the non-moving parties, must have been insufficient to permit a reasonable jury to find in their favor.  See, e.g., Wittekamp v. Gulf & Western, Inc., 991 F.2d 1137, 1141 & n.7 (3rd Cir.), cert. denied, 114 S. Ct. 309 (1993); Billet v. CIGNA Corp., 940 F.2d 812, 815 (3rd Cir. 1991).  Under this standard, we hold that judgment as a matter of law in favor of Bodine was improper.  In addition, contrary to the troopers' argument, we hold that judgment as a matter of law in their favor on this claim was likewise unwarranted.  As we previously observed, there was sharply conflicting evidence regarding the critical events in this case. Depending on which version of the facts it believed, a reasonable jury could have found for either side on the illegal entry claim. Accordingly, that claim should have been sent to the jury.

In considering the legality of the troopers' entry into the Bodine residence, we begin with the terms of the order of the Delaware Family Court, which is important both with respect to what it does and does not authorize.  We read the order as giving the troopers the authority to effect an involuntary transfer of the children from Bodine to Knight for the purpose of implementing Knight's visitation rights and to enter on Bodine's property for this purpose, but we do not read the order as giving the troopers the authority to enter the Bodine residence

9

unannounced.[0]  In other words, we view the order as giving the troopers authority similar for present purposes to that conveyed by an ordinary search or arrest warrant.  Such a warrant would authorize an executing officer to enter the property where the search or seizure was to occur but would not confer "no knock" authority unless the warrant so indicated.  An ordinary warrant is not construed as conferring such authority, and we do not so construe the court order involved here.  We simply do not see anything in the order that supports that construction.  Moreover, the troopers have not brought to our attention any authority for the proposition that the family court judge had the authority under state law to issue a "no knock" order, and even if he had such authority, it is not apparent that he had a factual basis for authorizing an unannounced entry at the time when the order was issued.

Since the family court order conferred authority similar to that of an ordinary search or arrest warrant, the troopers' authority to enter the Bodine residence in carrying out the mandate of that order was similar to that of an officer executing an ordinary warrant.  Last term, in Wilson v. Arkansas, 115 S. Ct. 1914 (1995), the Supreme Court addressed the question whether there are circumstances in which the Fourth Amendment

_____

[0]If we were called upon to decide whether the troopers have qualified immunity for the entry, we would ask whether a reasonable officer could have interpreted the order as granting the authority to enter unannounced.  But since the district court held that the troopers had waived this defense and they have not challenged that ruling on appeal, we do not address the issue of qualified immunity.

10

requires that officers knock and announce their presence before entering a dwelling for the purpose of making an otherwise lawful seizure or search.  After tracing the acceptance of the knock-and-announce rule by common law courts, the Court held that "[g]iven the longstanding common-law endorsement of the practice of announcement, we have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search or seizure."  Id. at 1918.  However, the Court added:

> This is not to say, of course, that every entry must be preceded by an announcement. The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests.

Id.  The Court noted some of the circumstances under which the common law did not require officers to knock and announce, and among these were "circumstances presenting a threat of physical violence."   Id. at 1918-19.

The Supreme Court's decision in Wilson was anticipated in large part by our decision in United States v. Nolan, 718 F.2d 589 (3rd Cir. 1983).  In that case, we held that there are circumstances in which the Fourth Amendment requires officers to knock and announce.  Id. at 600-02.  "We suggested that the Fourth Amendment does not impose a specific rule governing forced entries but rather imposes a general requirement of reasonableness, informed by the goals of preventing undue

11

invasion of privacy and destruction of private property."  United

States v. Stiver, 9 F.3d 298, 302 (3rd Cir. 1993), cert. denied,

114 S. Ct. 1115 (1994).  Moreover, in United States v. Kane, 637

F.2d 974, 978 (3rd Cir. 1981), in discussing the similar but not

necessarily identical knock-and-announce rule[0] codified in 18

U.S.C. §3109[0], we held that "a police officer's reasonable belief

that announcement might place him or his associates in physical

peril constitutes [an] 'exigent circumstance' . . . that

justifies non-compliance with the announcement provisions of the

statute."  See also United States v. Jewell, 60 F.3d 20, 23 (1st

Cir. 1995); United States v. Maxwell, 25 F.3d 1389, 1395 (8th

Cir.), cert. denied, 115 S. Ct. 610 (1994); United States v.

Buckley, 4 F.3d 552, 558 (7th Cir. 1993), cert. denied, sub nom.

Herman v. United States, 114 S. Ct. 1084 (1994).  In light of

these authorities, it seems clear that if the troopers in this

case had a reasonable belief that they were facing a "threat of

physical violence" when Bodine closed the door after speaking

with Warwick, the Fourth Amendment did not require them to knock

and announce their presence before entering the house.

A reasonable jury, viewing the evidence in the light

most favorable to the troopers, could have found the following.

Warwick, the officer who opened the door and entered first, knew

that domestic relations cases are dangerous, that Bodine had

previously resisted allowing visitation by Knight to the point of

---

[0]See Stiver, 9 F.3d at 301-02; Nolan, 718 F.2d at 600.
[0]As we noted in Stiver, 9 F.2d at 301-02, this statute applies to
federal officers.  It is thus inapplicable here.

12

standing in contempt, that Bodine had again failed to comply with a court order for visitation that morning, that the visitation dispute regarding Bodine's children was a matter of "officer safety concern" for his entire troop, and that Bodine had previously threatened that if the police came to his house again they would have to "pay" and that he would not let them arrest him. When Bodine answered the back door, he was surly and uncooperative. In response to Warwick's demand that the children be ready in five minutes, Bodine said that he would have them ready "when he felt like it." Bodine gave "nonverbal signs" of considerable emotion: he raised his voice; his eyes twitched; and his lips trembled. He slammed the door and attempted to hit Warwick with it in the face. And after Bodine did this, Warwick heard sounds that led him to suspect that Bodine was trying to lock the door. Based on these facts, a reasonable jury could conclude that the officers were justified in believing that Bodine was planning to use physical violence so as to avoid complying with the visitation requirement.

The troopers would have a stronger case if there was evidence in the record that Bodine had access to firearms or other lethal weapons in the house, but the absence of such evidence is a matter for the trier of fact to weigh. The parties have not brought to our attention any evidence that the troopers had a basis for being certain that there were no such weapons in the house, and the average house contains implements, such as knives and tools, that can be wielded with dangerous effect. Thus, the evidence, if viewed in a light favorable to the

13

troopers, was adequate to support a verdict in their favor on the illegal entry claim.

By contrast, if the jury believed Bodine's very different version of the events, the troopers lacked any reasonable basis for fearing physical violence from Bodine. Under this version of the events, Bodine did not turn over the children at 8 a.m. due to misunderstanding, offered to have them ready in five minutes, and did not slam the door in Warwick's face, but merely shut it "firmly" because it was swollen and difficult to close. Consequently, we hold that the issue of liability on the illegal entry claim should have been submitted to the jury.

In arguing that the district court erred in granting judgment as a matter of law for Bodine, the troopers rely, not only on the danger that they allegedly faced, but also on what they characterize as several other "exceptions" to the knock-and-announce rule: the "useless gesture,"[0] fear-of-flight,[0] and "hot pursuit"[0] exceptions. In view of the possibility that Bodine's illegal entry claim will be retried on remand, these arguments warrant comment. Under <u>Wilson</u> and <u>Nolan</u>, it does not appear to be strictly correct to view the Fourth Amendment as containing a knock-and-announce rule with certain fixed "exceptions." Instead, those cases interpret the Fourth Amendment as containing a flexible requirement that all searches and seizures be

---

[0]Citing <u>Ker v. California</u>, 374 U.S. 23, 47 (1963)(Brennan, J., dissenting in part); <u>Kane</u>, 637 F.2d at 978; <u>United States v. Singleton</u>, 439 F.2d 381, 385-86 (3rd Cir. 1971).
[0]Citing <u>Ker</u>, 374 U.S. at 74 (Brennan, J., dissenting); <u>Kane</u>, 637 F.2d at 978.
[0]Citing <u>Santana v. United States</u>, 427 U.S. 38 (1976).

14

"reasonable" and regard an officer's failure to announce his or her presence before entering a dwelling to carry out an otherwise lawful search or seizure as a factor to consider in assessing reasonableness. See Wilson, 115 S. Ct. at 1918; Nolan, 718 F.2d at 600-02.

With this understanding in mind, we think that the facts on which the troopers rely in advancing their "useless gesture" argument -- Bodine's knowledge that the troopers had already knocked twice and were outside his house -- are relevant but not dispositive in determining whether their entry was lawful. Because Bodine had seen the troopers and knew that they were outside, some of the dangers often associated with unannounced, forcible entries -- for example, the danger that the troopers would be mistaken for burglars[0] -- were diminished. On the other hand, other dangers that might have been avoided by knocking and announcing -- such as the danger that property would be destroyed and that an occupant of the house would reflexively react with violence[0] -- were present.

By contrast, the possibility that Bodine might have fled finds no support in the evidence and is therefore not a relevant factor to consider in judging the reasonableness of the troopers' conduct. Indeed, the troopers themselves testified that they did not think that Bodine was going to flee.

---

[0]See Sabbath v. United States, 391 U.S. 585, 589 (1968); Kane, 637 F.2d at 977.
[0]See Nolan, 718 F.2d at 602.

15

In invoking the "hot pursuit" exception, the troopers rely on United States v. Santana, 427 U.S. 38 (1976). They note that Bodine committed the offense of menacing when he slammed the door and tried to hit Warwick, and they argue that Warwick was in "hot pursuit" of Bodine to arrest him for this offense when he entered the house. Although Santana concerned a somewhat different question from the one presented by this case, we think that it has some (limited) relevance here. Unlike Wilson, Santana did not involve the authority of officers with a warrant to enter a dwelling unannounced to execute the warrant. Instead, Santana involved the authority of officers to enter a dwelling to make a warrantless arrest. As the Supreme Court later held in Payton v. New York, 445 U.S. 573 (1980), the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's house in order to make a routine felony arrest, but officers may make a warrantless arrest in a public place. See United States v. Watson, 423 U.S. 411 (1976). In Santana, the police tried to make a warrantless drug arrest supported by probable cause in a public place, but the suspect retreated into her house, and the police pursued and arrested her. Concluding that this did not violate the Fourth Amendment, the Supreme Court held that when officers attempt to make a warrantless arrest in a public place but the suspect flees into a dwelling the officers do not need a warrant to pursue the suspect and carry out the arrest. The Court noted the need for prompt action to prevent the destruction of evidence (id. at 43), and although the Court did not expressly refer to the authority of

16

the police to enter the house without announcement, that authority was certainly implicit in the court's holding.

Although, as we noted, Santana concerned a somewhat different question from that presented here, we have no doubt that, when the police attempt to make an arrest with a warrant in a public place and the suspect flees into his or her home and closes the door, it is reasonable for the police to pursue the suspect inside without stopping and announcing their presence and intentions at the threshold. This is so for several reasons. Since the suspect knows what the police are attempting to do, little purpose would be served by knocking and announcing. In addition, in many cases, as in Santana, there will be a danger that evidence will be destroyed if there is delay, and there will sometimes be a danger of flight or a threat of harm to the officers as well.

In this case, as previously noted, the troopers' fear for their safety is potentially an important factor, but the risk of flight is not supported by the evidence. Nor is there any suggestion that delay might have allowed Bodine to destroy evidence. As for the argument that an announcement was unnecessary because Bodine must have known that Warwick was trying to arrest him for menacing, while we cannot say that the troopers should not be permitted to argue this theory to the jury at a retrial if they wish to do so, it appears to have scant

17

support in the record.[0]  Warwick did not try to arrest Bodine before he slammed the door and retreated inside (if Bodine can be said to have done so); indeed, it was not until Bodine slammed the door and thus menaced Warwick that Warwick had grounds to arrest him.  Thus, it is not at all clear that Bodine knew, prior to Warwick's entry, that Warwick was seeking to arrest him for menacing.

In sum, we hold that the record in this case did not support judgment as a matter of law for either side on the illegal entry claim.  Only after the jury has resolved the disputed factual issues regarding the relevant factors that we have noted can it be determined whether the troopers' unannounced entry was reasonable.


III.

We now turn to Bodine's excessive force claim.  If this claim is viewed separately from the illegal entry claim, it seems clear that the jury should have been permitted to decide whether the troopers' use of force was excessive.  Under the troopers' version of the events, it was not.  According to the troopers, they were simply trying to handcuff and arrest Bodine, but he struggled to resist arrest.  By contrast, under Bodine's version, the troopers' conduct -- throwing him around the kitchen and

---

[0]Judge Becker finds no support in the record for this theory and no basis for concluding that Bodine knew prior to the officers' entry that they were seeking to arrest him.

18

causing his neck to "crack" while he offered no resistance--was plainly excessive.

The district court, however, did not allow the jury to decide which account should be believed, Instead, the court told the jury that it did not need to decide this question because, since the officers had entered the house illegally, any use of force was unlawful, and the officers were liable for all of the harm that ensued. This analysis was wrong for two independent reasons.

First, as we explained in part II of this opinion, the record did not permit judgment as a matter of law on the illegal entry claim, and accordingly the court's conclusion that the entry was illegal was premature. Second, even if the entry was unlawful, this would mean, under basic principles of tort law, that the troopers would be liable for the harm "proximately" or "legally" caused by their tortious conduct (i.e., by their illegal entry). See, e.g., Restatement (Second) of Torts §§ 431 and 871 cmt. l (1965 & 1979). They would not, however, necessarily be liable for all of the harm caused in the "philosophic" or but-for sense by the illegal entry. See, e.g., Restatement (Second) of Torts §§ 431 and cmt. a (1965). Among other things, they would not be liable for harm produced by a "superseding cause." See, e.g., Restatement (Second) of Torts §§440-453 (1965). And they certainly would not be liable for harm that was caused by their non-tortious, as opposed to their

19

tortious, "conduct," such as the use of reasonable force to arrest Bodine.[0]

A simple hypothetical will illustrate the importance of these distinctions in a case such as this. Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." See George v. City of Long Branch, 973 F.2d 706 (9th Cir. 1992), cert. denied, 113 S. Ct. 1269 (1993). The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

_____

[0]In reaching the conclusion that the officers' illegal entry rendered any later use of force unreasonable, the district court relied on Schwab v. Wood, 767 F. Supp. 574, 585 (D. Del. 1991), which held that officers who detain a suspect without a reasonable suspicion are liable (unless shielded by qualified immunity) for harm caused by the use of any amount of force in effectuating that detention. We find this holding questionable for reasons similar to those discussed in text. Officers who detain a suspect unlawfully should be liable for the harm proximately caused by their tortious detention, but this will not necessarily include all harm resulting from the otherwise reasonable use of force to carry out the detention.

20

If at a retrial in this case the jury decides that the troopers' entry was unlawful, it will be necessary to determine how much of the injury suffered by Bodine was "proximately" or "legally" caused by the illegal entry, and we express no view on this question at this time. We merely emphasize that this determination must be made and that the illegal entry and unlawful force claims must be kept separate. Thus, if the troopers are found to have entered the Bodine residence illegally, they should be held liable for the harm proximately caused by the illegal entry. Similarly, if the troopers are found to have used unlawful force, they should be held liable for the harm proximately caused by this use of force. The harm proximately caused by these two torts may overlap, but the two claims should not be conflated.

IV.

For these reasons, the judgment of the district court is reversed, and the case is remanded for further proceedings. Each party is to bear his own costs.