OPINION OF THE COURT

STAPLETON, Circuit Judge:
This is an action brought under 42 U.S.C. § 1983 and state law alleging that the City of Wilmington, Delaware, and Wilmington Police Detective Michael R. Lawson, Jr., (collectively, “Defendants”) violated the Fourth and Fourteenth Amendments, and committed state law false imprisonment and battery, when Lawson and an armed SWAT team of the Wilmington Police Department executed an allegedly invalid search warrant by entering the home of Plaintiffs DeWayne Walker, Sr., his wife, Karen Walker, their teenaged son, DeWayne Walker, Jr., and their two-year-old daughter (collectively, “Plaintiffs”), seizing Plaintiffs, and searching the premises. The warrant authorized the search for and seizure of evidence relating to a recent homicide that the police believed had been committed by Dwayne A. Walker, whose date of birth was 12/10/82. As Defendants now acknowledge, Dwayne A. Walker is unrelated to Plaintiffs and has never been to their home at 118 Dutton Drive, New Castle, Delaware.
The District Court granted summary judgment to the Defendants on all of Plaintiffs’ federal claims and declined to exercise supplemental jurisdiction over their state claims. Because we write only for the parties, we will presume knowledge of the record. We will affirm in part and reverse in part.
I.
On September 13, 2005, a man named DeWayne Freeman was stabbed to death during a drug-related dispute in Wilmington. Based on statements from witnesses *307 at the scene, the police suspected that Dwayne A. Walker was the killer, and on that day, Lawson applied for an arrest warrant for Dwayne A. Walker.
Lawson was the chief investigator of the Freeman homicide, and as such, he retrieved Dwayne A. Walker’s criminal record from the Delaware Criminal Justice Information System (“DELJIS”). This record showed an address of 703 West Fifth Street in Wilmington, but when a police officer went to that address, the occupant stated that Dwayne A. Walker did not live there.
On September 14, 2005, a confidential informant who had observed the murder contacted Detective Jeff Silvers, one of Lawson’s colleagues. This informant had assisted Silvers with more than twenty criminal investigations over the preceding five-year period and had proved reliable. The informant told Silvers that Dwayne A. Walker was staying with the informant’s sister-in-law,[1] and later that day, the informant brought Silvers to the sister-in-law’s house to show him where it was. When the police returned to arrest Dwayne A. Walker, he could not be found.
The informant contacted Silvers again later the same day to advise him that Dwayne A. Walker’s “mother lived in Wilton, and if he wasn’t at [the] sister-in-law’s house, that’s probably [the] most likely place he could be found,” because “the first thing [Dwayne A. Walker] would do was run to his mom, which he always done whenever he got in trouble.” App. at A277-78, A292. The informant did not purport to have been in contact with Dwayne A. Walker. He did not know if Dwayne A. Walker had any kind of plan at the time, and he did not know if Dwayne A. Walker in fact went to his mother’s house. The informant did not know the address of the mother’s house, aside from the fact that it was in the Wilton area of New Castle and that she had moved there recently,[2] but he informed Silvers that her boyfriend and daughter (Dwayne A. Walker’s sister) might be living with her. Silvers immediately told Lawson what the informant had told him. Lawson remembers that the informant told “Silvers that he wasn’t sure of the mom’s name or the mom’s name may have been different from” Dwayne A. Walker’s last name. Id, at A216.
Regarding what kind of car Dwayne A. Walker’s mother drove at the time, the informant gave the following testimony at his deposition:
Q. What kind [of automobile did the mother have]?
A. At that time she had a Maxima.
Q. A Maxima?
A. Yes. Nissan Maxima, maroon.
Id. at A281. A short while later, the questioning regarding the car continued:
Q. So did you tell Detective Silvers that Dwayne Walker’s mother drove a Lexus?
A. Did I tell him she drove a Lexus?
Q. Yeah.
A. No.
Q. And she didn’t did she?
A. No. She drove a Maxima at that time.
Q. Was there a Lexus? Did you provide him with information that you thought there might be a Lexus at that house?
A. No. Not that I know of.
*308 Q. Did Detective Silvers ask you whether you knew what kind of cars may have been in the driveway or parked on the street next to this house?
A. I believe he did, but I couldn’t provide that because — Dwayne’s family, like I said, they had a couple dollars, so they could have been driving just about anything.
And then he had friends — I mean, personally. He growed up around and in my house. I knew he sold a lot of drugs. So it’s possible that they could have not only been driving a Lexus; they could have been driving a Jaguar.
Q. But you earlier testified that his mother drove a Maxima.
A. I seen her driving a Nissan Maxi-ma, yes, I did.
Q. Did you tell Detective Silvers that?
A. Yes, I did, but then he asked me were there any other vehicles. I told them it could have been anything because, like I said, they had a little bit of money at the time.
Id. at A290-91.
Based on the information from the confidential informant, Silvers entered the name “Dwayne Walker” into DELJIS to determine if anyone with that name was residing in the Wilton area of New Castle. This search yielded a report of a larceny having occurred on September 6, 2003, on Appleby Road in the Wilton Park area of New Castle. The larceny report listed as the victim Karen Alicia Walker, an African-American woman born November 10, 1962, and residing at 118 Dutton Court in New Castle, and as a witness Dwayne Walker, Jr., with no middle name or date of birth but also residing at 118 Dutton Court. In fact, the larceny report concerned the 2003 theft of plaintiff DeWayne Walker, Jr.’s, bicycle, the report having been filed by plaintiff Karen Walker, De-Wayne Walker, Jr.’s, mother.
Silvers was not assigned to the Freeman homicide, so he gave all of this information to Lawson for his investigation, and Lawson followed up by placing a telephone call to Connectiv Power Company of Delaware, whose records indicated that a “DeWayne Walker” was billed at 118 Dutton Drive[3] in New Castle. While there is a difference in the spellings of the first names of Dwayne A. Walker and plaintiff DeWayne Walker, Sr., because Lawson spoke with Connectiv on the telephone, he did not pick up on the discrepancy. Lawson determined that 118 Dutton Drive is in New Castle, Delaware, behind an area known as Wilton.
Lawson then put 118 Dutton Drive under surveillance for several hours. The undercover officers conducting the surveillance reported that a dark-colored Lexus automobile was parked outside the house, and the license plate on the car was registered to Karen Walker. In addition, the surveillance revealed that a female and teenage male were seen exiting the house, and there “was also a possibility that there was a small child in the residence.” Id. at A136.
On September 14, 2005, Lawson applied for a warrant to search 118 Dutton Drive for evidence concerning the Freeman homicide. The final three paragraphs of Lawson’s Affidavit of Probable Cause state as follows:
8. Your affiant can truly state that on 9-14-05, a past proven rehable informant contacted Detective Jeff Silvers of the Wilmington Police Drug Unit with information as to the whereabouts of the *309 suspect, Dwayne Walker. The informant stated Walker is currently hiding at his mother’s house in New Castle and is making plans to flee Delaware.
9. Your affiant can truly state that according to DELJIS records, a Dwayne Walker DOB 12-10-82 with a previous reported incident at 118 Dutton Drive in New Castle.
10. Your affiant can truly state current records with Connectiv Power Company of Delaware show 118 Dutton Drive, New Castle registered to Dwayne Walker. A check on DELJIS currently shows Dwayne Walker Sr. with a current address of 118 Dutton Drive in New Castle.
Id. at A115-16. On that day, a magistrate issued a search warrant, which authorized only a daytime search of the residence.
A police SWAT Team and a K-9 Unit entered Plaintiffs’ home[4] with weapons drawn, rounded up all four Plaintiffs, gathered the family together in the living room, and swept through the remainder of the house. Plaintiffs testified that the SWAT team caused physical damage to the home, including stained carpets and broken doors, furniture, and railings.
Once the SWAT team confined the family in the living room, Lawson realized that a mistake had been made, and that he was in the wrong house. Lawson apologized and gave his business card to DeWayne Walker, Sr., in case Plaintiffs wanted to contact the police about any damage to the home. The encounter lasted approximately twenty to thirty minutes.
II.
Following discovery, Defendants moved for summary judgment. In the course of granting the motion with respect to Plaintiffs’ federal claims, the District Court concluded that: (1) “the search warrant was supported by probable cause and not procured in violation of plaintiffs’ Fourth Amendment rights;” (2) “defendants’ use of force was not unreasonable in violation of the Fourth Amendment;” and (3) “[njo reasonable jury could conclude on this record that defendants purposefully discriminated against plaintiffs on the basis of race.” Walker v. City of Wilmington, 579 F.Supp.2d 563, 573, 574, 577 (D.Del.2008).
On appeal, Plaintiffs make three principal arguments. First, they contend that the search warrant that authorized the raid on Plaintiffs’ home was defective because Lawson made false assertions in, and omitted pertinent facts from, his affidavit of probable cause submitted to the magistrate. Plaintiffs insist that “[w]hen the false statements are removed and the omissions added, there is no probable cause” for the search. Appellants’ Br. at 23. Second, Plaintiffs contend that Defendants used excessive force in executing the warrant. Plaintiffs argue that Defendants violated the “knock and announce” rule, the rule against unnecessary nighttime home searches, and a state law limiting the jurisdiction of the Wilmington Police Department. These violations are said to demonstrate the unreasonableness of Defendants’ conduct. Finally, Plaintiffs contend that Defendants violated their Equal Protection rights under the Fourteenth Amendment, because the police targeted Plaintiffs’ home for the raid because Plaintiffs are African-Americans.
III.
For reasons that will become apparent hereafter, we first address Plain *310 tiffs’ Equal Protection claim. It is based upon a brief portion of the Defendants’ answer to the amended complaint and a brief portion of Lawson’s deposition. Defendants gave the following responses to the following allegations of that complaint:
Complaint (App. at A352)
49. Plaintiffs Walker, Sr., Plaintiff K. Walker, Plaintiff Walker, Jr. and Plaintiff T. Walker have no common identification with the individual being sought by the Defendants other than being African-American with the household surname of Walker.
50. The actions of Defendants traveling out of their jurisdiction were taken because of Plaintiffs’ race.
Answer (App. at A361)
49. Denied. By way of further explanation, the suspect sought was named Dwayne Walker, which is almost identical to the name of Plaintiff DeWayne Walker. Also by way of further explanation, the Dwayne Walker sought was previously transported by someone named Alicia Walker, and Plaintiff Karen Walker’s middle name is Alicia. Also by way of further explanation, Dwayne Walker was the same race as Plaintiff DeWayne Walker, and Alicia Walker was the same race as Plaintiff Karen Alicia Walker.
50. Denied.
Lawson gave the following deposition testimony regarding this segment of the Defendants’ answer:
THE WITNESS: But as far as race, race has nothing to do with this. I mean, the only consistency is that my suspect, he was arrested for homicide, was black, and Mr. Walker and his family are black. And that’s the only thing. But that has nothing to do with oranges or apples. It’s just what it is.
BY MR. BARTOSHESKY:
Q. Are you saying that when you did the DELJIS report on Karen Walker, if that had shown up as a Caucasian woman, would anything have been different in this case?
A. Probably.
Q. And why would that be?
A. Because that would throw up a flag to me that maybe it’s a different Walker from what I was being told.
App. at A232.
Plaintiffs characterize this answer and testimony as admissions by Lawson that “race was a deciding factor in his determination that 118 Dutton should be invaded” and that “if the records did not show that Karen was black, the invasion would not have happened.” Appellants’ Br. at 36. However, this answer and testimony are more properly characterized as showing simply that the police considered Plaintiffs’ race insofar as it made it more probable that there was a familial relationship between Plaintiffs and Dwayne A. Walker. The police were searching for an African-American suspect, so it was reasonable for them, when looking for the suspect’s mother, to seek out an African-American woman. No reasonable jury could conclude from this evidence or from any other evidence in this record that racial animus motivated the search of Plaintiffs’ home.
IV.
The same answer must be given to Plaintiffs’ primary argument in support of their Fourth Amendment unreasonable search claim. They insist that a reasonable jury could conclude from this record that Lawson knew that Karen Walker was not Dwayne A. Walker’s mother before he applied for the search warrant, ie., that his case for probable cause was a wholly fraudulent construct. There is no direct evidence and virtually no circumstantial evidence tending to contradict Lawson’s *311 testimony that he did not know this fact at that time. In the absence of some reason why Lawson would mobilize a SWAT team and K-9 Unit to search the home of a family whom he did not know and whom he knew had no connection with Dwayne A. Walker, a reasonable jury could clearly not find that Lawson had the claimed knowledge. The only reason tendered by Plaintiffs is that Plaintiffs are African-Americans. However, as we previously indicated, the record will not support a finding that racial animus was responsible for the search of Plaintiffs’ home.
On the contrary, the evidence dictates a conclusion that the raid on 118 Dutton Drive was the result of an unfortunate mistaken belief that Karen Walker was the mother of Dwayne A. Walker. Moreover, while a more careful and thorough investigation may have avoided this mistake, given the similarity of the names involved, the misspelling of Plaintiff DeWayne Walker, Jr.’s, name on the DELJIS report of the 2003 larceny, and the odds against two families with such similar names living in the vicinity of Wilton, our study of the record convinces us that the allegations of Lawson’s affidavit regarding 118 Dutton Drive being the home of the suspect’s mother could not be found to be knowingly false or made “in reckless disregard of the truth.” Wilson v. Russo, 212 F.3d 781, 787 (3d Cir.2000).
However, this conclusion cannot end our analysis under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), because other allegations were included in Lawson’s affidavit, most importantly that Dwayne A. Walker would indeed be at his mother’s home. Based on the testimony of Lawson and Silvers, a jury could find that Lawson had the same knowledge of the information conveyed by the informant as Silvers had. A jury could, accordingly, further find that the informant, while reliable, (1) did not purport to have had any contact with the suspect, (2) did not purport to know or even to have been told by anyone where the suspect was hiding, and (3) did no more than speculate that the suspect “most likely” went to his mother’s house because that would be characteristic behavior for him. Moreover, viewing the evidence in the light most favorable to Plaintiffs, a jury could find that Lawson knew the informant’s information would not be sufficient to secure a search warrant in the absence of corroboration and, accordingly, directed that surveillance of Plaintiffs’ home be conducted. It could further find that the surveillance produced no evidence of the suspect’s presence there.
It is in this context that a jury could find that Lawson made his representation to the magistrate: “a past proven reliable informant ... stated [that] Walker is currently hiding at his mother’s house in New Castle and is making plans to flee Delaware.” App. at A115. We conclude that this representation regarding the whereabouts of Dwayne A. Walker was not only inaccurate but could be found by a jury to be knowingly false or made in reckless disregard of the truth.
If a jury so concluded, there is no question that the misrepresentation was material for purposes of a Franks analysis. The informant’s “statement” was the only information in the affidavit that provided any reason to believe the suspect was at 118 Dutton Drive. Moreover, while an inconclusive effort at corroboration is normally not material in a search warrant application, where the only pertinent information is as speculative as it was here, we believe that the results of the surveillance could be found to be material.
Thus, when we correct Lawson’s affidavit as instructed by Franks, the only statement supporting probable cause to believe *312 the suspect was hiding at 118 Dutton Drive is as follows:
8. A past proven reliable informant first informed Detective Jeff Silvers that Dwayne A. Walker could be found at his sister-in-law’s. When advised that Dwayne A. Walker was not there, the informant indicated that if he wasn’t at the sister-in-law’s house, he would most likely be found at his mother’s because he always runs to her when he’s in trouble. While the informant did not know the mother’s address, he stated that she lived in Wilton. When my investigation provided reason to believe that a Dwayne Walker, Sr., and Karen Walker live at 118 Dutton Drive, I caused that residence to be surveilled for several hours and that surveillance provided no affirmative reason to believe Dwayne A. Walker was present there.
“Probable cause exists to support the issuance of a search warrant if, based on a totality of the circumstances, ‘there is a fair probability that ... evidence of a crime will be found in a particular place.’ ” Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir.1997) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). While the reconstructed affidavit supports the proposition that evidence of Dwayne A. Walker’s guilt might conceivably be found at 118 Dutton Drive, a jury could find that it falls short of demonstrating a probability that such would be the case. See Groman v. Twp. of Manalapan, 47 F.3d 628, 635 (3d Cir.1995) (reversing summary judgment for defendant officer because jury could find that he lacked probable cause).
We thus conclude that the District Court erred in granting summary judgment on the Fourth Amendment search claims on the ground that the search warrant was supported by probable cause, and we will remand for further proceedings on those claims. With respect to those claims, the District Court did not reach Lawson’s qualified official immunity defense or the issues raised by the City under Monell v. New York City Dep’t of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Accordingly, we express no opinion with respect to them.
V.
If a jury determines that the search warrant was invalid, there will be no occasion to address whether the search and seizure were otherwise unreasonable under the Fourth Amendment. Plaintiffs, however, assert a number of additional, affirmative, and independent grounds for reaching that same conclusion and providing a basis for a remedy.
A.
“Determining whether the force used to effect a particular seizure is ‘reasonable’ under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the countervailing governmental interests at stake.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal citations and quotations omitted). Thus, the proper application of the test of reasonableness “requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Id. “[T]he question is whether the officers’ actions are ‘objectively reasonable’ in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation,” and this determination must be made “from the perspective of a reasonable officer on the scene, rather *313 than with the 20/20 vision of hindsight.” Id. at 396-97, 109 S.Ct. 1865 (citing Scott v. United States, 436 U.S. 128, 137-39, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); Terry v. Ohio, 392 U.S. 1, 20-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).
In this case, the police, in addition to seeking evidence of a crime, were attempting to arrest a murder suspect. Murder is, of course, a very serious crime that makes it objectively reasonable for the police to deem the suspect potentially dangerous. Thus, it appears that the District Court’s conclusion that having a large, armed SWAT team and a K-9 Unit present was not unreasonable is correct. Additionally, the SWAT team gathered and confined Plaintiffs in the living room, and as soon as the police realized that they were in the wrong place, they explained the situation and left the premises. Under the circumstances at the time, this conduct was not objectively unreasonable and provides no independent basis for holding the search and seizure to be constitutionally unreasonable.
B.
Justice of the Peace Courts in Delaware may issue warrants statewide. Stroik v. State, 671 A.2d 1335, 1338 (Del.1996). We agree with the District Court and with the Court of Appeals for the Tenth Circuit that, when officers have a valid search warrant from a magistrate of the relevant jurisdiction, the requirements of the Fourth Amendment are met even if the executing officers “are acting outside their jurisdiction as defined by state law.” United States v. Green, 178 F.3d 1099, 1106 (10th Cir.1999).
C.
“[T]he method of an officer’s entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search and seizure.” Wilson v. Arkansas, 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). Under the “knock and announce” rule, “police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry.” Richards v. Wisconsin, 520 U.S. 385, 387, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). However, not “every entry must be preceded by an announcement. The Fourth Amendment’s flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests.” Wilson, 514 U.S. at 934, 115 S.Ct. 1914.
Thus, a “no-knock” entry “is justified when, ‘the police [] have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime.’ ” Kornegay v. Cottingham, 120 F.3d 392, 397 (3d Cir.1997) (quoting Richards, 520 U.S. at 394, 117 S.Ct. 1416). “Courts have upheld dispensing with the knock-and-announce requirement in four situations: (1) the individual inside was aware of the officers’ identity and thus announcement would have been a useless gesture; (2) announcement might lead to the sought individual’s escape; (3) announcement might place the officers in physical peril; and (4) announcement might lead to the destruction of evidence.” Id. (citing Richards, 520 U.S. at 394, 117 S.Ct. 1416; Wilson, 514 U.S. at 935-37, 115 S.Ct. 1914; Bodine v. Warwick, 72 F.3d 393, 397 (3d Cir.1995); United States v. Stiver, 9 F.3d 298, 302 (3d Cir.1993); United States v. Kane, 637 F.2d 974, 978 (3d Cir.1981)).
The District Court concluded that “although the police had conducted surveillance of the house and had officers and dogs positioned outside ..., the record [did] not show that the police knew and had covered all avenues of escape from 118 *314 Dutton Drive.” Walker, 579 F.Supp.2d at 575. Accordingly, it held that “it was reasonable for the officers to suspect that knocking and announcing might lead to suspect Walker’s escape.” Id.
The District Court held in the alternative that there was no evidence (1) that Lawson was present at the time of the entry or was otherwise responsible for the manner in which it was effected, or (2) that the “no-knock entry was the result of the City’s policy or failure to train.” Walker, 579 F.Supp.2d at 575 n. 20 (citing Monell, 436 U.S. at 691, 98 S.Ct. 2018). We will affirm the District Court on this claim based on these alternative holdings.
Lawson testified that he was not on site when the entry was made, and there is no evidence to the contrary. Based on the record as a whole, a jury could not find that Lawson was responsible for the manner in which the SWAT team entered the Plaintiffs’ home. Similarly, there is no record evidence from which a jury could find that the City was responsible under Monell for the manner of entry.
D.
Lawson applied for, and was granted, only authorization to search 118 Dutton Drive in the daytime. This is understandable. Section 2308 of Title 11 of the Delaware Code, by which both Lawson and the magistrate were bound, provided as follows:
A search warrant shall not authorize the person executing it to search any dwelling house in the nighttime unless the judge, justice of the peace or magistrate is satisfied that it is necessary in order to prevent the escape or removal of the person or thing to be searched for, and then the authority shall be expressly given in the warrant. For purposes of this section the term “nighttime” shall mean the period of time between 10:00 p.m. and 6:00 a.m.
As a result, Lawson’s affidavit and the magistrate’s authorization do not address whether a search conducted between 10:00 p.m. and 6:00 a.m. would be reasonable and the authorization was thus limited to a “daytime” search, ie., a search between 6:00 a.m. and 10:00 p.m.
We were confronted with a similar situation in United States ex rel. Boyance v. Myers, 398 F.2d 896 (3d Cir.1968). We ruled as follows:
The time of a police search of an occupied family home may be a significant factor in determining whether, in a Fourth Amendment sense, the search is “unreasonable.” At common law, prior to the adoption of the Fourth Amendment, there was a strong aversion to nighttime searches. Even the odious “writs of assistance” which outraged colonial America permitted search of dwellings only in the daytime. The significance of this aversion of the common law to nighttime searches is underscored by the Supreme Court’s reminder that the search and seizure clause is properly “construed in the light of what was deemed an unreasonable search and seizure when it was adopted.” Carroll v. United States, 1925, 267 U.S. 132, 149, 45 S.Ct. 280, 284, 69 L.Ed. 543.
During the early years of the republic this common-law tradition was embodied in two statutes passed by our first Congress that authorized only daytime searches. Thereafter, the reluctance to authorize nighttime searches except under exceptional circumstances continued as an integral part of our jurisprudence. * * *
Here it is claimed that the search, though made late at night, was reasonable because authorized by a warrant issued by a magistrate ... However, the issue whether the search was in fact authorized by the warrant is determin *315 able by a reading of the warrant’s simple and unambiguous language. To find that a warrant which is explictly limited to daytime searches legalizes search at any hour of the day or night would be to disregard the magistrate’s actual determination and thus to nullify the requirement of a prior impartial determination that a particular search will be reasonable. “When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman, or Government enforcement agent.” Johnson v. United States, 1948, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436.
The record does not show, in possible justification for this action, any reason for apprehension that the evidence within the house would be removed, hidden or destroyed before morning. Accordingly, we hold the search constitutionally invalid.
Boyance, 398 F.2d at 897-99 (authorities, acts, statutes, and citations omitted except when quoting).
The District Court correctly understood the teaching of Boyance:
Unless the police had “reason for apprehension that the evidence within the house would be removed, hidden or destroyed before morning[,]” executing the daytime search warrant earlier than 6:00 a.m. would render the search “constitutionally invalid.” United States ex rel. Boyance v. Myers, 398 F.2d 896, 899 (3d Cir.1968). Conversely, executing the daytime search warrant at 6:00 a.m. or later would not.
Walker, 579 F.Supp.2d at 576. The District Court held, however, that the Plaintiffs were bound by an allegation in their amended complaint that the SWAT team entered the residence at “approximately 6:05 a.m.” and, accordingly, that the officers conducted a “daytime” search.
The Court held Plaintiffs to be so bound based on “the sham affidavit doctrine.” Id. It explained that under “the sham affidavit doctrine, ‘a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.’ ” Id. We conclude that the District Court’s application of this well established doctrine in this case results from a misunderstanding of the record and the rationale of the doctrine.
As we explained in Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir.2007):
[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit eviden-tiary weight and that summary judgment is appropriate.
The main practical reason supporting the sham affidavit doctrine is that prior depositions are more reliable than affidavits. The Second Circuit noted in Perma Research [& Development Co. v. Singer Co.] that “[t]he deposition of a witness will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination.” 410 F.2d [572] at 578 [2d Cir.1969] ... Affidavits, on the other hand, are usually drafted by counsel, whose familiarity with summary judgment procedure may render an affidavit less credible.
Here, the conflict identified by the Court arose when the Plaintiffs sought to rely upon the deposition testimonies of Karen Walker and DeWayne Walker, Jr., that were inconsistent with an allegation in their unverified amended complaint. As the Court noted, the allegation was that the SWAT team burst through the door at *316 “approximately 6:05 a.m.” When asked about this segment of the complaint during her subsequent deposition, Karen Walker testified:
Q. Where were you in the house when the police came through the front door?
A. I was actually in the laundry room/ coat closet, and I was about to put on my daughter’s coat when they came in. And looking at this, I see it says approximately 6:05, but it had to be before 6:00 o’clock because I leave out at 6:00. And my son’s alarm clock goes off at 6:00 for him to wake up.
Q. So the statement in there is wrong?
A. By probably about ten minutes, the time.
Q. Okay. When did you realize that the statement was wrong?
A. When I read it.
Q. Where did the statement come from?
A. It came from my husband.
Q. Okay. He was wrong?
A. He wasn’t as accurate. I wouldn’t say, “Wrong.” He just wasn’t to the minute.
App. at A385.
DeWayne Walker, Jr., testified that he was asleep in his room when he was awakened by a “bang at the door.” When asked when the SWAT team left, he testified:
Q. Did they eventually leave?
A. Yes.
Q. About what time did they leave?
A. I know it was before 6:00, because my alarm hadn’t gone off yet.
Q. They left before 6:00?
A. Yes.
Id. at A299. There is thus testimony from which a jury, if permitted, could conclude that the twenty to thirty minute episode was concluded before 6:00 a.m.
The record reveals that neither Plaintiffs’ original complaint nor their amended one was verified by any Plaintiff. Moreover, in context, it is clear that the deposition testimony they sought to rely upon was not created in the face of a motion for summary judgment. Accordingly, we conclude that the “sham affidavit doctrine” is inapposite here.
This does not mean that the allegation that still remains in Plaintiffs’ amended complaint is of no consequence. Pleadings frame the issues to be litigated in each case, and the parties are circumscribed by the positions they take there unless and until an amendment is effected. Plaintiffs could have moved under Fed.R.Civ.P. 15 to amend their amended complaint to conform to their deposition testimony, and they did not. They were not, however, confronted with a contention grounded in the rules of pleading. If that had been Defendants’ position in support of their motion for summary judgment, it is reasonable to expect that a motion to amend would have been filed.
The District Court is in a better position than are we to determine whether an amendment to conform to Plaintiffs’ deposition testimony should be permitted at this stage of the proceedings or whether the averment in the complaint that the intrusion occurred at 6:05 should remain a binding judicial admission. See, e.g., Sovereign Bank v. BJ’s Wholesale Club, Inc., 533 F.3d 162, 181 (3d Cir.2008). We express no view on that matter. We conclude, however, that Plaintiffs, on remand, should be permitted to file such a motion.
VI.
The District Court’s judgment in favor of Defendants on Plaintiffs’ equal protection claim, excessive force in execution of the warrant claim, and failure to “knock and announce” claim will be affirmed. The judgment with respect to all other claims will be vacated, and this matter will be *317 remanded to the District Court for further proceedings consistent with this opinion.

. The informant's sister-in-law is the mother of two of Dwayne A. Walker's children.

. According to the testimony of Plaintiff Karen Walker, Wilton is a housing development in New Castle, Delaware. Plaintiffs' home is not in the Wilton development but is instead about one half-mile from the development.

. Apparently, Dutton Drive and Dutton Court are the same street in New Castle, Delaware. See App. at A204. Plaintiffs do not appear to dispute this point.

. Plaintiffs allege that the front door was locked, and that the police broke down the door in order to enter the premises, forcing it open so violently that it crashed into a table in the foyer area. App. at A385, A398. Defendants contend that the front door was unlocked, and the police simply entered the house. Id. at A136, A185.